UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 16-00179 (RBW) |
| | : | |
| ARZU SAGSOZ , et al | : | |
| | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM
IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Memorandum in support of its Motion for Pretrial Detention of Defendant ARZU SAGSOZ under 18 U.S. C. § 3142 (f) (2)(A).

**APPLICABLE LAW**

A defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e). A finding of either risk of flight or danger is sufficient for detention. *See, e.g., United States v. Ferranti*, 66 F.3d 540, 543-44 (2nd Cir. 1995). For a detention decision based upon risk of flight, the government only need prove by a preponderance of the evidence that there are no conditions or combinations of conditions that will assure the defendant's appearance as required. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). Furthermore, at a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

In considering whether there are conditions of release, which will reasonably assure the

safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).  As set forth more fully below, these factors weigh in favor of detaining the defendant.

## FACTUAL BACKGROUND

From approximately April 2012 to September 2012, SAGSOZ and others attempted to illegally export an aircraft engine from the U.S. to Iran for profit without first obtaining the required licenses.  SAGSOZ caused shipment of the aircraft engine to be made from the U.S., with the express purpose of then re-exporting the aircraft engine from Turkey to Iran.  SAGSOZ concealed the ultimate end-user of the purchased aircraft engine from companies, shippers, and freight forwarders located in the U.S.  SAGSOZ did not obtain the required license or authorization from the U.S. government to ship an aircraft engine to Iran.  SAGSOZ evaded U.S. licensing requirements, and disguised the true intent and destination of the aircraft engine by using a Turkish intermediary, to purchase the engine from the U.S. SAGSOZ took actions to help conceal the end user of the aircraft engine, including communicating payment confirmation for the engine to a U.S. company that was funneled through accounts outside of the U.S. to accounts of companies within the U.S.

In 2012, U.S. law prohibited the export or re-export of U.S.-origin commercial aircraft engines to prohibited destinations, including Iran, without a license from the U.S. Department of Treasury, Office of Foreign Assets Control (OFAC), or the U.S. Department of Commerce.

On March 17, 2008, the U.S. Department of Commerce signed a Temporary Denial Order (TDO) denying Mahan Air's export privileges. The TDO broadly prohibited Mahan Air and/or other persons or companies acting for or on Mahan Air's behalf, directly or indirectly, from participating in any U.S. export transaction. The TDO was in effect at all times relevant to the conduct in this case.

On October 12, 2011, OFAC added Mahan Air to the OFAC Specially Designated Nationals (SDN) list for providing financial, material, and technological support to the Islamic Revolutionary Guard Corps-Qods Force. The SDN designation limits Mahan Air's ability to engage in U.S. dollar transactions, and prohibits any goods, technology, or services from being exported, re-exported, sold or supplied, directly or indirectly, from the U.S.

SAGSOZ operated as a logistics and purchasing agent for a Turkish aviation company. The Turkish aviation company brokered aircraft parts and related goods on behalf of foreign customers including brokering a transaction to purchase an aircraft engine with serial number 517621 (ESN 621) from a company in the U.S., indicating that the purported buyer was an aviation company in Turkey, when in fact, the aircraft engine was destined for Mahan Air in Iran.

SAGSOZ was responsible for procuring U.S. origin items requested by Iranian clients and was a principal participant in a violation concerning the procurement of ESN 621, which occurred in approximately July 2012.

As early as April 2012, SAGSOZ was made aware of U.S. export control laws. In April 2012, SAGSOZ participated in e-mail conversations with an employee of a U.S. company[1] concerning the purchase of an Inertial Navigation Unit (INU). The conversations were regarding a

---

[1] The U.S. company referenced in this paragraph is separate and distinct from the U.S. company from which SAGSOZ and her co-conspirators purchased ESN 621.

license application that was submitted to the U.S. Government on behalf of the Turkish aviation company in order to export the INU from the U.S. to Turkey. During those conversations, the U.S. company informed SAGSOZ about an export license that was required to export the INUs, and SAGSOZ emailed the U.S. company to provide supplemental information in order to receive the export license.

On June 28, 2012, SAGSOZ, on behalf of the Turkish aviation company, signed a "Statement by the Ultimate Consignee/Purchaser," which stated in part, "[w]e will not sell, transfer, lease export or re-export or otherwise dispose (hereafter "transfer") any product(s), technology or software to Cuba, Iran Iraq, North Korea, Syria, or Sudan unless otherwise authorized by the U.S Government." The statement also contained the following: "We acknowledge that U.S. law prohibits the Transfer or other participation in any export transaction involving Product(s) Acquired from [***] with individuals or companies listed in the U.S. Commerce Department's Denied Persons List, the U.S. Treasury Department's list of Specially Designated Nationals…" The statement was initialed by the Turkish aviation company's Operations Manager and signed by SAGSOZ.

On approximately July 20, 2012, the Turkish aviation company caused a wire transfer in the amount of U.S. $710,000 to be sent from a financial institution in Turkey into a trust account at a financial institution in the United States, which represented the outstanding balance due to the U.S. Company for the purchase of ESN 621.

On July 20, 2012, SAGSOZ sent an email to a U.S. logistics company informing the company that payment for the ESN 621 had been sent, and to proceed with shipping the jet engine. On July 24, 2016, a Turkish freight forwarder sent SAGSOZ an email which contained an air

waybill and other shipping documents concerning the export of ESN 621 engine from the U.S. to Turkey.

On approximately July 21, 2012, ESN 621 was exported from the United States to the Turkish aviation company.  On July 25, 2012, the Turkish aviation company's Commercial Manager sent an email to SAGSOZ asking for news regarding Mahan Air's payment for the ESN 621.  On the same day, SAGSOZ responded to the Commercial Manager, and said that Mahan Air paid for spare parts but payment concerning the jet engine was pending negotiations.

On July 25, 2012, U.S. law enforcement sent a re-delivery order to the jet engine's freight forwarder and the jet engine was returned to the United States.  On July 28, 2012, SAGSOZ sent an email to the Turkish aviation company's Commercial Manager and Operations Manager informing them that the ESN 621 had been interdicted by the U.S. Department of Commerce.

In September 2012, following seizure by U.S. customs of U.S.-origin goods, including ESN 621, purchased by the Turkish aviation company, that company began operating under another name.  On September 21, 2012, the Turkish aviation company's Commercial Manager sent an email to SAGSOZ which stated:  "If we will accept their quotation then we have to purchase them with name of [the original unnamed Turkish aviation company] and You know better with which problems we will be face on !!!!  So My Advi[c]e and decision is to proceed with [the new name] and sometimes just send fake RFQs or less important RFQs with [the original Turkish aviation company] name to show that with [the original Turkish aviation company] is working."  On September 22, 2012, SAGSOZ replied to the original Turkish aviation company's Commercial Manager and stated:  "I agree to you, thank you for your advi[c]e, in order to maintain our relation with our supplier this is the best choice until all problem being solved, I explained all of these ideas

to him however he doesn't care to me and begins to shouting as usual, I rarely send our rfq from [the unnamed Turkish aviation company] after now."

**ARGUMENT**

**The Defendant Should Be Detained Pending Trial Because She Poses a Substantial Risk of Flight.**

In light of the conduct in this case, the defendant's lack of ties to the United States and the penalties the defendant faces for perpetrating this scheme, pretrial detention is necessary to ensure that the defendant does not flee to evade prosecution.

    A.    **The nature and circumstances of the offense**

The nature and circumstances of the offense weigh in favor of detention. The grand jury found probable cause to believe that the defendant committed conspiracy to commit substantive offenses against the United States in violation of 18 U.S.C. § 371; a violation of International Emergency Economic Powers Act (IEEPA) and the Iranian Transactions Regulations (ITR), in violation of 50 U.S.C. § 1705 and 31 Code of Federal Regulations (C.F.R.) Part 560; a violation of IEEPA and the Export Administration Regulations (EAR) in violation of 50 U.S.C. § 1705 and 31 C.F.R. Parts 730-774; and conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).

The essential nature of this offense involves deception. The defendant knowingly and willingly deceived the U.S. government by purchasing an aircraft engine from the United States, without the required license, while knowing that a license was required and that the engine was destined for Iran.  If the defendant was willing to deceive the federal government when she conspired to purchase the aircraft engine for profit, there is no reason to believe that she will not deceive this Court if she vows to return to court to face a trial and a potentially lengthy jail sentence.

The charges against the defendant expose her to a serious period of incarceration. The IEEPA charges alone carry a maximum penalty of twenty years incarceration. Moreover under the U.S. Sentencing Guidelines, if convicted after trial she faces 63-78 months incarceration. Additionally, if convicted after trial of Conspiracy to Commit Money Laundering she faces 78-97 months incarceration.

### B. The weight of the evidence against the defendant

The weight of the evidence against the defendant is strong. The evidence consists of the defendant's incriminating emails in which she communicates with prohibited Iranians at Mahan Air and conspirators in Turkey. The defendant directly signed End/User Certification forms falsely acknowledging compliance with U.S. Export Regulations and specifically that products would not be sent to prohibited countries like Iran. The emails and certification forms indicate the defendant was well aware of U.S. licensing requirements.

### C. The history and characteristics of the defendant

The defendant is a Turkish national with experience in logistics and procurement in the aviation industry. Notwithstanding that, it is important to note again that deception was the foundation of the scheme to purchase U.S. aircraft engines for a prohibited SDN, Mahan Air in Iran. We reiterate that the defendant knew what she was doing was illegal and she deliberately avoided complying with U.S. laws. The defendant has no ties to the United States and is in this country solely for the purpose of prosecution. She will likely be taken into Immigration custody for removal proceedings if the Court were to release her. Accordingly, this Court should not trust that the defendant will not flee the United States if she is released before trial.

**CONCLUSION**

For the foregoing reasons, the government respectfully submits that a preponderance of the evidence establishes that the defendant is a serious risk of flight and no conditions or combinations of conditions will assure her appearance in Court. Accordingly, the government respectfully requests that the Court grant the government's motion to detain the defendant pending trial in this case.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472845

By: _____/S/_____
BRENDA J. JOHNSON
Assistant United States Attorney
D.C. Bar No. 370737
555 Forth St., N.W.
Washington DC 20530
(292) 252-7801
Brenda.Johnson@usdoj.gov

By: _____/S/_____
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar No. 82960
555 Forth St., N.W.
Washington DC 20530
(292) 252-7201
Erik.Kenerson@usdoj.gov