**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CASE NO. 1:16-cr-00179-RBW** |
| **ARZU SAGSOZ,** | **HON. REGGIE B. WALTON** |
| **Defendant.** | **Sentencing Date: January 10, 2019** |

## ARZU SAGSOZ'S MEMORANDUM IN AID OF SENTENCING

Arzu Sagsoz respectfully submits that the Court should sentence her to time served with no additional incarceration in the United States and permit her immediate removal to Turkey. Ms. Sagsoz has already spent a significant amount of time in prison, under horrific conditions. There is no need for a sentence of additional incarceration to satisfy the statutory requirements of sentencing.   Ms. Sagsoz requests both a downward departure and downward variance or adjustment.   While the government believes that a thirty-three month sentence is appropriate, Ms. Sagsoz's low level of involvement, *de minimis* financial gain, and the horrific conditions of her incarceration are more than necessary to achieve the goals of sentencing.

Based on a totality of circumstances analysis, Ms. Sagsoz should be entitled to a downward departure for at least two reasons:

- **Length and Severity of Presentence Confinement.**  Prior to being extradited to the United States, Ms. Sagsoz spent nine months in grueling prison conditions in the country of Georgia.  The conditions were so severe that Ms. Sagsoz began taking heavy anti-depressants and medications, in part, because one of her prison mates committed suicide by cutting her wrists with the barbed wire surrounding the prison.

- **Extraordinary Family Circumstances.** Ms. Sagsoz's fiancé has persistent and ongoing mental health issues to include severe anxiety and panic attacks. Although Ms. Sagsoz's fiancé has other family members, these family members are unable to care for him due to age or their own family obligations. Ms. Sagsoz is the only person who can calm her fiancé down and help her fiancé when he experiences these mental issues. Because of her absence, Ms. Sagsoz's fiancé's symptoms have become persistently worse, so much so that he is unable to come to the United States to see her.

Moreover, Ms. Sagsoz requests that this Court find that the § 3553(a) factors, and other adjustments, overwhelmingly favor a below-Guidelines sentence for a downward variance or adjustment setting up her removal to Turkey as soon as possible:

- **Ms. Sagsoz has no criminal history.** Ms. Sagsoz presents no risk of committing a future crime. She has no prior criminal record, and the facts of this case and Ms. Sagsoz's family and life history demonstrate that she will not be at risk to reoffend. Additionally, Ms. Sagsoz has agreed to judicial removal, and, if necessary, will agree to supervised release wherein she will not be involved in the airline industry for employment. Such concessions demonstrate that the public would be protected from any further crimes.

- **Ms. Sagsoz's personality traits and her family/community involvement warrant a variance.** This case has had a tremendous impact on Ms. Sagsoz. She has taken responsibility for her actions, deeply regrets her role, and is incredibly remorseful. In addition, as demonstrated by the letters submitted by her family, she has substantial family support, and her family has been deeply impacted by this case. Additionally, Ms. Sagsoz desperately wants to have children with her fiancé; yet, because of her age, her

window to do so is closing.  There is no need for more retribution, further deterrence, or incapacitation.

- **Ms. Sagsoz cooperated significantly and immediately with the government and accepted responsibility for her actions.**  Ms. Sagsoz's cooperation warrants at least a three-level reduction, as the Government recommends.

- **Ms. Sagsoz's role in the entire operation at the enterprise is minor.**  Ms. Sagsoz had limited to no interaction from the end user and followed all of the instructions made by her supervisor.   Additionally, she was paid *very* little for her work, and she took out the garbage and cleaned the office as well.  She was constantly ridiculed and yelled at by her supervisors.  Importantly, unlike the engineer who worked with the company, Ms. Sagsoz never received a commission for any of the parts the company sold, including the engine.  For these reasons, which are discussed more fully below, the Court should impose a sentence of time served and permit Ms. Sagsoz's immediate removal to Turkey.

## BACKGROUND

Ms. Sagsoz has never before been involved in criminal activity and, in fact, her initial involvement in this matter was as a low level employee unaware that her company was violating sanctions between the United States and Turkey.  When she ultimately learned the truth about her employment, she was repeatedly told that she was not breaking the law because she was not in the United States.  Her first and only criminal conduct began when, after working at Kraal, she was brought into this conspiracy.  With a limited education, Ms. Sagsoz neither conceived of this criminal activity, arranged it, supervised it, nor even knew how to accomplish it once it began.  Hers was a ministerial role, lacking in the sophistication and expertise of her co-conspirators, and certainly, her financial gain was in no way comparable to the true leaders of this conspiracy.

And, while ignorance of the United States sanction laws and their world-wide reach is not a defense, it is clear that Ms. Sagsoz neither comprehended the seriousness of her conduct nor the implications of being involved in the purchase of aircraft parts.

Ms. Sagsoz knows that this choice was the single greatest mistake of her life. To get involved with these individuals in their conspiracy has brought great shame and humiliation on her and her family, caused significant hardship and heartache, and taken so much away from what was an already challenging family situation.

Ms. Sagsoz neither denies becoming involved nor does she blame those who recruited her and supervised this scheme for the choices she made. It was wrong, she knows that, and she has admitted it from the first moment she was approached.

Ms. Sagsoz, while on vacation with her fiancé, was arrested and placed in prison in debilitating conditions in the country of Georgia. She remained there, with little food, no sewage system, and very little hope for nine months. During this time, she became extremely depressed and began taking heavy anti-depressants. The conditions of her incarceration in Georgia are beyond anything that would ever be permitted in the United States. She was held in conditions that were unimaginable. *See infra* Sec. I(A).

Ms. Sagsoz was then extradited here to America, where she has spent almost seven months detained by American authorities, unable to really speak the language and interact with individuals around her. She has gone from the horrific third world conditions of a former Soviet republic to an American jail where she neither speaks the language nor understands the culture. While the physical conditions have improved dramatically from Georgia to the CTF, the isolation has not. She is jailed in a country and culture that she has never before experienced with a language with which she is barely functional, over 6,000 miles from her loved ones. She

has had contact with her family and fiancé via telephone and mail, and has had to face them having done something so inconsistent with her character. The disappointment and shame has been tremendously difficult at times.  The impact on her mental well-being and the stress that this has been on her cannot be overstated as she has spent nearly sixteen months away from her family and friends in unknown countries that she does not call home.

Not a day goes by that Ms. Sagsoz does not think about why she is here and how she can return to be with her family, to see her recently-born niece, and start to build a family with her fiancé.[1]  And while Ms. Sagsoz fully accepts responsibility for what she did and where she put herself with her conduct, this is not indicative of the law abiding, family oriented, decent woman that she is.

Ms. Sagsoz is a dedicated and loving oldest sister to two younger siblings.  She also is the sole caretaker for her fiancé, who has suffered from mental health issues his whole life, including severe anxiety and panic attacks.  He relies solely on Ms. Sagsoz for his care, and Ms. Sagsoz has helped him get better.  Yet, from the moment she was confined, he noticed his symptoms returning.  Now, his illness is so bad he cannot come to see Ms. Sagsoz, and he has difficulty managing his daily life.  In short, Ms. Sagsoz is more than just a committed and dedicated sister and fiancé, who is longing to start a family of her own; she is for significant periods of time with great frequency, a primary caregiver to her fiancé.

### STANDARD OF REVIEW

Although the Supreme Court declared the Guidelines advisory, there is a three-step process to determine an appropriate sentence.  *See Gall v. United States*, 552 U.S. 38, 49-50

---

[1]   Ms. Sagsoz and her fiancée were on a short vacation when she was arrested on the international warrant.  She had traveled many times in the region, but never had issues with the warrant at customs.  She was aware that her co-defendant had been arrested, served his 30-month sentence, and returned to Turkey.  She and her fiancé had a wedding planned and were hoping to immediately try to start a family, given Ms. Sagsoz's age.

(2007). First, the Court must calculate the applicable Guidelines range. *Id.* Second, after the parties are given an opportunity to argue for whatever sentence they deem appropriate, the Court should then determine whether to apply any of the Guideline's departure policy statements to adjust the range. *Id.* at 50. And, finally, the Court must then consider all factors under 18 U.S.C. § 3553(a) to determine, under all the circumstances, whether they support the sentence requested. *Id.* Most fundamentally, the last step requires the Court to "make *an individualized assessment* based on the facts presented" to decide whether to vary from the Guidelines range. *Id.* at 50 (emphasis added).

*Sentencing Guideline Calculation*

All parties agree Total Offense Level under the Guidelines, pursuant to the Plea Agreement entered in this case is 20; and Ms. Sagsoz's criminal history category is I.

## ARGUMENT

Ms. Sagsoz requests that, based on the totality of circumstances and the facts of her case, this Court grant a downward departure and a variance under the factors set forth in § 3553(a) and sentence Ms. Sagsoz to time served and remove her to Turkey immediately.

## I.    A DOWNWARD DEPARTURE IS WARRANTED.

There are two reasons why a downward departure is warranted: (1) the length and severity of Ms. Sagsoz's presentence confinement in Georgia, and (2) her extraordinary family circumstances.

### A.    Ms. Sagsoz Spent Nine Grueling Months in Intolerable and Degrading Conditions in a Georgian Prison.

"Like alienage, downward departure based on the length or severity of presentence confinement would be permissible in the proper case." *U.S. v. Shah*, 263 F. Supp. 2d 10, 35 (D.D.C. 2003). In order for a downward departure to be appropriate, the confinement must be

"atypical" or "unusual."  *Id.*; *accord U.S. v. Sutton*, 973 F. Supp. 488, 494 (D.N.J. 1997), *aff'd*

156 F.3d 1226 (3d Cir. 1998) (". . . the Court concludes that it has the authority to depart based

on atypical conditions of pretrial confinement.")

As one activist group explains, in Georgia's attempt to bring its prisons up to "European

standards", "it appears that Georgia devised something much worse:  a testing ground for radical,

terrible criminal justice policies." *See, e.g.*, Slade, Gavin & Jeiranashvili, *Georgia's Disastrous*

*Attempt to Bring Prisons Up to "European Standards"*, Open Society Foundations (March 10,

2015),  found  at  https://www.opensocietyfoundations.org/voices/georgia-s-disastrous-attempt-

bring-prisons-european-standards.  In addition, the International Society for Human Rights once

described the Georgian prisons as a system that "amounts to an offence against internal standards

for correctional facilities" and the "human rights of the inmates are simply being ignored."  See

Davitaia, Prof. Dr. Avtandil, *ISHR Georgia Report 2010: Prison Conditions in the Republic of*

*Georgia*,  found  at  http://www.ishr.org/archive/russiaeurasia-archive/seiten-ie/ishr-georgia-

report-2010-prison-conditions-in-the-republic-of-georgia/.

Ms. Sagsoz's own family describes the terrible conditions she had to endure during her

time there.  Ms. Sagsoz's sister explains that she took Ms. Sagsoz "a few pieces of food to the

extent that the jail rules allowed it.  That is because there was no food in the prison she was

staying at and what she could buy at the cafeteria with her own money was really limited."  *See*

Ex. 1, Letter from Asli Sagsoz.[2]  During her first month in Kutaisi, Georgia prison, Ms. Sagsoz

could not interact with anyone because she did not speak the same language as other inmates.  *Id.*

And, Ms. Sagsoz's sister describes how a woman on Ms. Sagsoz's ward committed suicide after

---

[2]  All of the letters received in this matter are from Ms. Sagsoz's family and friends and one of
her attorneys in Georgia.  None of the letters were in English in their original form.  Counsel for
Ms. Sagsoz retained an interpreter, Cagri Tanyol, to interpret the letters from Turkish to English.
Mr. Tanyol is a federally-certified Turkish interpreter who appears before this Honorable Court.

the woman cut her wrists on the barbed wire surrounding the prison. *Id.*; *accord* Ex. 2, Letter from Vasfettin Uzumcu, Ms. Sagsoz's fiancé. Her body was not recovered until the morning. *See* Ex. 1.

Ms. Sagsoz was then sent to Rustavi, Georgia prison where there did not appear to be a working sewage system; in fact, Ms. Sagsoz's sister describes the conditions as "a heavy smell of sewage and mold." Ex. 2. Ms. Sagsoz was locked in a cell for twenty-four hours a day and had no access to a television or radio. *Id.* Ms. Sagsoz's sister would bring her two packets of cheese and vegetables and fruit, and, because there was no cooler or fridge, Ms. Sagsoz hung the cheese from the bars. *Id.*

Additionally, Ms. Sagsoz had trouble receiving necessary medical treatment because of the language barrier and lack of resources in Georgia. *See* Ex. 3, Letter from Enver Bardak, Esq., Ms. Sagsoz's Georgian lawyer. Ms. Sagsoz was limited to one hour of bathing a week, and she developed a feminine hygiene illness for two months. *Id.* And, while Ms. Sagsoz enjoyed reading books, her lawyer sent a request three times asking for a list of books Ms. Sagsoz would like, and each time the request was denied. *Id.* It was only two and a half months later when officers from the Turkish Embassy came to visit her did Ms. Sagsoz receive some books. *Id.*

The conditions were so severe that Ms. Sagsoz began taking heavy anti-depressants and medications. *See id.*; *accord* Ex. 3.

But, even while in Georgian prison, Ms. Sagsoz tried to help people. As Ms. Sagsoz's Georgian lawyer explained, Ms. Sagsoz took care of a woman who stayed in Ms. Sagsoz's ward for nearly eight months and asked her lawyer if her lawyer would be willing to help this woman. *See* Ex. 2. Ms. Sagsoz shared the food her family brought and also asked her family if they could give money to other women on her ward. *See* Ex. 1.

Ms. Sagsoz's confinement in the Georgian prison system is exactly the type of atypical and unique situation described in *Shah* that should warrant a downward departure here. Her presentence confinement in Georgian prison changed Ms. Sagsoz. As her family and lawyer explains, Ms. Sagsoz had to be placed on heavy anti-depressants, which affected her ability to focus and complete daily tasks. She suffered tremendous turmoil during her time in the Georgian prisons because she lacked access to food, a functioning sewage system, bathing, and medical resources. Additionally, she was unable to leave her room every day, and could not watch television or listen to the radio, and, despite her requests, she could not even receive a book to read. For nine months, Ms. Sagsoz suffered in these conditions only to be extradited to another country, where she does not speak the language, to serve another nearly seven months. Ms. Sagsoz has been punished enough. Therefore, she respectfully requests a downward departure based on her presentence confinement in Georgia and asks this Court to sentence her to time served and permit her removal to her home, Turkey.

### B.       Ms. Sagsoz Has Extraordinary Family Circumstances that Warrant a Downward Departure.

The District of Columbia Circuit Court permits a downward departure based on family and community ties in extraordinary circumstances. *See In re Sealed Case*, 292 F.3d 913, 917 (D.C. Cir. 2002). Courts permit a downward departure for a defendant in extraordinary circumstances when the defendant is the sole or primary caretaker of a family member with mental illness. *See, e.g., U.S. v. Haversat*, 22 F.3d 790, 797 (8th Cir. 1994) (finding downward departure appropriate where defendant's wife suffered from severe psychiatric problems, which could be life threatening); *U.S. v. Gaskill*, 991 F.2d 82, 86 (3d Cir. 1993) (explaining downward departure may be appropriate and trial court may avoid imposing any period of incarceration where defendant was solely responsible for care of his mentally ill spouse). For example, in *U.S.*

*v. Leon*, the Ninth Circuit permitted a downward departure based on extraordinary circumstances where the defendant was the only person available to tend to his wife, who had a kidney removed and suffered from depression prior to defendant's indictment.  *See U.S. v. Leon*, 341 F.3d 928, 932-34 (9th Cir. 2003)

Here, Ms. Sagsoz has an extraordinary family circumstance that warrants a downward departure because she is the primary caretaker for her fiancé, who has always suffered from severe mental illness to include severe anxiety and panic attacks.  *See* Ex. 2.  Although Ms. Sagsoz's fiancé has other family members, these family members are unable to care for him due to age or their own family obligations.  *Id.*  Ms. Sagsoz is the only person who can calm her fiancé down and help her fiancé when he experiences these mental issues.  *Id.* As her fiancé explains:  "Arzu was always on my side with my illness and always supported me and I, through the relationship with Arzu, with her care, understanding and patience came over this illness. . . . I suffered during this process as much as Arzu for . . . living away from her caused my illness to restart. That is why I cannot come to see her in the United States. . . . [F]or me to regain my health, I need Arzu." *Id.*  Accordingly, Ms. Sagsoz would ask this Court to find her situation to be an extraordinary family circumstance that warrants a downward departure.

## II.   THE § 3553(a) FACTORS AND GUIDELINE ADJUSTMENTS OVERWHELMINGLY FAVOR A BELOW-GUIDELINES SENTENCE THAT INVOLVES IMMEDIATE REMOVAL TO TURKEY.

In analyzing the § 3553(a) factors and Guideline adjustments, this Court should sentence Ms. Sagsoz to time served and immediately permit her removal to Turkey.

A.      **Analysis of § 3553(a) Factors**

*§ 3553(a) (1) – The Nature And Circumstances Of The Offense And The History And Characteristics Of Arzu Sagsoz*

"[A] defendant's degree of remorse at sentencing may be considered as a basis for downward variance under § 3553(a) regardless of whether the defendant previously accepted responsibility." *U.S. v. Howe*, 243 F.3d 128, 132, 138 (3d Cir. 2008) (permitting probation sentence where Guidelines range was from 18 to 24 months where defendant "recognize[d] the serious [ ] nature of the offense" and was "truly remorseful.")  Ms. Sagsoz knows what she did is wrong and is genuinely remorseful for her actions.  *See U.S. v. Martin*, 520 F.3d 87, 95 (1st Cir. 2008) (affirming downward variance, in part, because sentencing court found that "defendant's family was unusually supportive; that the sincerity of his remorse, together with his character and personality traits, indicated a capacity for rehabilitation not frequently seen in recidivist defendants.")

Ms. Sagsoz deeply regrets her involvement in the purchase of these aircraft parts.  She wishes to put this matter behind her and focus on having children with her fiancé.  Her personal history and characteristics make it highly unlikely (inconceivable, really) that she will commit a crime in the future.  She has no prior criminal history and strong ties to her family and friends, demonstrating that she will not be at risk to reoffend.  *See* Ex. 4, Letters from Ms. Sagsoz's family and friends.  Ms. Sagsoz has been removed from her family, friends, and fiancé for nearly sixteen months.  She has been detained in two countries where she does not speak the language.  And, she regrets her actions that brought her here.

Moreover, Ms. Sagsoz is described as a helpful, sincere, and warm person by her family and friends.  *See* Ex. 4.  One friend, Gencay Aslantas, notes how Ms. Sagsoz is always helping everyone, including street animals by leaving pet food out for them.  *Id.*  And, Ms. Sagsoz's

brother describes how Ms. Sagsoz cared for his wife after she broke both of her legs by cooking them food and cleaning their house for about a month and a half while his wife recovered. *Id.* Now, her brother has a daughter whom Ms. Sagsoz has never met. *Id.* Ms. Sagsoz has missed so much with her family and friends. Simply put, she just wants to go home and continue to be the good, kind, and caring person she has always been.

### § 3553(a) (2) (B) – The Need For The Sentence To Afford Adequate Deterrence To Criminal Conduct

As stated above, the felony conviction itself has a chilling effect on Ms. Sagsoz and any other individual tempted to engage in such a scheme. While Ms. Sagsoz understands the seriousness of her conduct, she has already spent fifteen months detained in jail here in the United States or in prisons in Georgia; she just wants to go home to be with her family and friends in Turkey. A further jail sentence on top of these other repercussions is unnecessary and will have a deleterious effect on her ability to put her life back together, and, while detained, she may run out of time to have children with her fiancé. Ms. Sagsoz has learned so much from her involvement in the instant offense.

### § 3553(a) (2) (C) and (D) — The Need for the Sentence to Protect the Public from Future Crimes by Ms. Sagsoz

We submit, and believe that the United States would not dispute, that Ms. Sagsoz poses absolutely no future threat of any criminal wrongdoing. The facts of this incident are unique and were she ever to be approached by anyone with a similar scheme again, she has certainly learned her lesson and would not be at risk to go down this same road a second time.

These factors make Ms. Sagsoz an especially strong candidate for avoiding any further involvement with the criminal justice system.

12

### *§ 3553(a) (3) And (4) — The Kinds Of Sentences Available*

The Court will be properly exercising its authority by imposing a sentence that does not involve any further incarceration and immediately remove Ms. Sagsoz.  Indeed, further incarceration in this case will serve no additional purpose, other than to prevent Ms. Sagsoz from picking up the pieces of her life, taking care of her fiancé, and having a child of her own.

Section 3553(a)(2) requires the Court to take into account "the need for the sentence imposed--"

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  "These four considerations – retribution, deterrence, incapacitation, and rehabilitation – are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes . . . to the extent that they are applicable' in a given case. *Tapia v. United States*, 564 U.S. 319, 325 (2011) (quoting 18 U.S.C. § 3551(a)) (alteration and omission in original).

A sentence involving further incarceration here is not necessary to promote any of the purposes set forth in § 3553(a)(2).  No more retribution or deterrence is warranted.  Given what she has gone through already and her personal history and characteristics, Ms. Sagsoz presents as low a risk of recidivism as can be imagined.  Rehabilitation is not an issue here.  Accordingly, a sentence of time served and immediate removal to Turkey is appropriate.

**B.     Ms. Sagsoz Cooperated Significantly and Immediately with the Government and Accepted Responsbility for her Actions.**

A defendant may be entitled to a reduction for acceptance of responsibility under the Guidelines.  *See* U.S.S.G. §3E1.1.  When a defendant notifies authorities that he/she intends to enter a plea of guilty at an early point in the process so the government can avoid preparing for trial, and the court can schedule its calendar efficiently, a defendant is permitted at least a three-level reduction.  *Accord U.S. v. Babell*, 890 F. Supp. 13, 17-18 (D.D.C. 1995).

Ms. Sagsoz has tried to cooperate with authorities since her original arrest in Georgia. *See* Ex. 3.   As her lawyer explains, the Georgian lawyers were actively attempting to gather information from the prosecution to see how Ms. Sagsoz could help.  *See* Ex. 3.  Ms. Sagsoz, through her attorneys, requested the Georgian prosecutors to provide information on how Ms. Sagsoz may be able to accept a plea or discuss the case with them. *see also* Ex. 5, Jan. 16, 2018 and Feb. 7, 2018 Email Correspondence between Ms. Sagsoz's Georgian Attorneys and Georgian Prosecutors.  She tried to help while detained in Georgia; her counsel in Georgia submitted an application to the prosecution indicating her willingness to help the prosecution; and she sat through two full days debriefing the Government.      Because  of  Ms.  Sagsoz's acceptance of responsibility right away and her cooperating with the Government, this Court should sentence her to time served and immediate removal to Turkey.

**C.  Ms. Sagsoz's Role in the Conspiracy Was Minor.**

To determine if a role was minor, the Court should compare the defendant's role with the apparent roles of the other participants.  *See U.S. v. Ingram*, 816 F. Supp. 26, 35 (D.D.C. 1993); *accord* U.S.S.G. §3B1.2 Commentary (n. 3) (explaining adjustment under guidelines warranted when the loss exceeded the defendant's personal gain or defendant had limited knowledge of the scope of the scheme).

In *United States v. Coates*, 295 F. Supp. 2d 11, 10 (D.D.C. 2003), for example, the court found that the defendant's role was minor where her actions were directed by at least two other individuals, who, in most instances, defendant had to consult with before she could sell the drugs and, on one occasion, defendant was in possession of the drugs herself. *Accord Ingram*, 816 F. Supp. at 35 (permitting reduction where defendant's role in drug conspiracy was very minimal where he only had some individuals in his home).

Moreover, a defendant is entitled to a four-level reduction where a defendant's role is "on the very bottom rung of" the matter and the defendant lacks the necessary education, skills, and resources. *See U.S. v.* Jackson, 756 F. Supp. 23, 25, 26 (D.D.C. 1991); *see also U.S. v. Patricia*, 912 F. Supp. 596, 627-28 (D. Mass. 1995) (permitting four-level reduction for defendant's minimal participation where defendant was charged with accessory after the fact to commit murder because he did not know in advance of the murder or about the burial of the body and, although, he worked with murderers, he did not know about, or personally participate in, the commission of the offense).

Here, Ms. Sagsoz was at the bottom rung of the enterprise. Her actions were directed by at least two other individuals who she almost always consulted before she could send emails or sign documents. She did not know who the end users of the products were. She only worked on the U.S. and Turkey side and never knew where the final destination was, who the end user was, or who the client was.

In addition, Ms. Sagsoz was paid $200.00 a month for her work, and she was constantly ridiculed and yelled at by her supervisors. Unlike the engineer who worked with the enterprise, who had an engineering degree, received commissions from the parts sold, and traveled to America to examine the parts, including the engine, Ms. Sagsoz's role was very different. She

does not have an engineering degree and could not identify whether the engines were in good condition or for what planes the engines were fitted.  Importantly, she never received a commission for any of the parts the company sold, including the engine.  And, she never traveled to America on behalf of the company to inspect any parts.  In all, her role was very minimal and accordingly she would request that this Court sentence here to time served and immediately remove her to Turkey.

## **CONCLUSION**

Ms. Sagsoz should receive a downward departure and downward variances and adjustments for her sentence to be time served and immediate removal to Turkey.  Ms. Sagsoz presents no risk of committing a future crime because her lack of a prior criminal record and her desire to care for and provide for her family, especially her fiancé.  Ms. Sagsoz has done everything that she possibly could with regard to her cooperation and should be given the appropriate reduction that she has earned based on her minimal role in the matter.  With the sentences available, and her conduct and individual characteristics, a sentence without further incarceration is certainly justified and appropriate.

For the foregoing reasons, the Court should sentence Ms. Sagsoz to a sentence that permits her immediate removal to Turkey.

January 8, 2019                                    Respectfully submitted,


       /s/ Mark E. Schamel
Mark E. Schamel (Bar No. 463965)
Ana L. Jara (Bar No. 1023086)
WOMBLE BOND DICKINSON (US) LLP
1200 Nineteenth Street, N.W.
Suite 500
Washington, DC  20036
Tel: 202-857-4481
Fax:  202-261-0098
Email:  mark.schamel@wbd-us.com
Email:  ana.jara@wbd-us.com

*Counsel for Defendant Arzu Sagsoz*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of January, 2019, copies of the foregoing document were filed through the Court's ECF system, which will provide notice to all parties indicated on the electronic filing receipt.

/s/ Mark E. Schamel
Mark E. Schamel